Argued and submitted August 31, 1995, affirmed March 6, appellant's petition for reconsideration filed March 20 allowed by opinion May 1, 1996
See 140 Or App 574, 915 P2d 489 (1996)

STATE OF OREGON,
*Respondent,*

*v.*

TIMOTHY ALAN HINKHOUSE,
*Appellant.*

(C9309-36386; CA A84175)

912 P2d 921

Peter Gartlan, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

## LANDAU, J.

Defendant is infected with the human immunodeficiency virus (HIV). He was convicted of ten counts of attempted murder, ORS 163.115, and ten counts of attempted assault I, ORS 163.185, based on his conduct of engaging in unprotected sexual intercourse with a number of victims without disclosing his medical condition. On appeal, he argues that the convictions must be set aside, because the evidence is insufficient to establish that he intended to cause the death of or serious physical injury to any of his several victims. The state argues that the evidence is sufficient to support the convictions. We agree with the state and affirm.

We state the facts in the light most favorable to the state. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Defendant learned that he had tested positive for HIV in 1989. That year, he began a sexual relationship with P.B., who was 15 years old at the time. At the end of the summer, defendant moved to California, but he returned six months later and renewed his sexual relationship with P.B. During that relationship, defendant refused to use condoms, saying that he did not like them. He and P.B. did not discuss HIV. In July 1990, defendant again left. P.B. asked defendant why he was leaving. In the course of his explanation, defendant told P.B. that she might want to get tested for HIV. P.B. was tested and, in August 1990, she learned that she was HIV-positive. A few months later, defendant called P.B. and said that he wanted to meet with her. When they met, defendant asked whether she had been tested. P.B. responded, "[W]ell, you should know my status because you gave it to me." Defendant did not deny the accusation, but just "brushed it off."

On November 3, 1990, defendant told his probation officer, Bill Carroll, that defendant was HIV-positive. Carroll immediately advised defendant of the implications of his HIV status, explaining the seriousness of the disease and the manner in which it is transmitted. Carroll explained that using a condom limits the risks of transmitting the virus, but he also explained that it would not eliminate the risk entirely. He told defendant that if he passed the virus to another person, "he would be killing someone." Over the next

several months, Carroll and defendant continued to have conversations about HIV and the need to take precautions to avoid transmitting the virus. In a telephone conversation in 1991, Carroll again cautioned defendant: "If you infect anyone, that is murder." Defendant said that he understood and agreed that he would take appropriate precautions.

In 1992, defendant was taken into custody on a probation violation. He and Carroll continued their conversations about the danger defendant posed by continuing to engage in sexual relationships. According to Carroll, defendant said that he understood the situation and that "he would cease and desist from any kind of [sexual] activity." Nevertheless, defendant continued to engage in sexual relations with a number of women. When he was taken into custody again for another probation violation later that year, he was heard bragging about his sexual prowess with women, expressing neither concern nor remorse for the people whom he might have exposed to HIV. As a condition of his release, however, he signed a probation agreement that included a commitment not to engage in any unsupervised contact with women without express permission from his parole officer.

In 1993, defendant began several sexual relationships without notifying Carroll. In each case, he refused to use a condom during sex and failed to disclose his HIV status. In May of that year, he began a sexual relationship with P.D. He never used a condom and said nothing about HIV.

In June of 1993, defendant began having sex with L.K. She demanded that defendant use a condom, and he did so for three or four weeks. On one occasion, he promised to use a condom, but then he penetrated her without one, in spite of L.K.'s protests. L.K. and defendant then had a long talk about safe sex, in which defendant told her that he had just ended a long-term relationship, that he had not engaged in any risky behavior since then, and that he had recently tested negative for HIV. Defendant and L.K. resumed their sexual relationship. Defendant, however, persisted in failing to use a condom. When L.K. expressed concern about his behavior, defendant replied that there was no need to wear condoms, because, if either of them had HIV, the other already had been exposed. Defendant agreed to be tested for HIV, but never followed through.

After a brief hiatus, defendant and L.K. continued their sexual relationship. Defendant's sexual behavior became very rough. He would engage in intercourse so vigorously that L.K. would bleed. When L.K. complained, defendant's attitude was "very casual," even proud. Defendant also insisted on engaging in anal intercourse, and, although L.K. said that she was "dead set" against it, defendant attempted anal sex several times. She complained that, although at times he could be gentle, he was becoming "very rough and very rude," and that he would be "mean and spiteful and try[] to be hurtful." L.K. ended her relationship with defendant in August of 1993.

The following month, defendant began a sexual relationship with R.L. She suggested that defendant buy condoms, but he told her, "I don't believe in them." R.L. suggested that defendant might have HIV, but he denied that, saying, "I don't have it, and whoever is telling you is lying."

Throughout 1993, defendant continued to meet with his probation officer on a weekly basis. During that time they would discuss defendant's HIV status. At no time did defendant mention P.D., L.K. or R.L.

Around the same time that defendant began seeing R.L., he also began a romantic relationship with M.S. Defendant hopes that he and M.S. will marry someday. M.S. was aware of his HIV status, and defendant always wore condoms when he had sexual intercourse with her.

At trial, Dr. Beers explained that HIV is transmitted through bodily fluids, including semen. He said that even nontraumatic sexual intercourse is an effective method of transmitting the disease and that more violent sex or anal sex increases the risk of transmission, because of the increased likelihood that tears in tissue break down the body's barriers to the virus. He explained that a person may be infected after a single sexual exposure.

Defendant's psychologist, Dr. Norman, testified that defendant had a long history of acting out sexually and that he suffered from attention deficit disorder. He opined that defendant understood how HIV is transmitted and that it is a fatal disease. Norman also testified that, although defendant had reportedly threatened in 1991 to "go out and

spread" HIV, he did not lend much credence to such threats. According to Norman, defendant simply did not think about the consequences of his behavior.

The state's expert, Dr. Johnson, agreed that defendant suffers from attention deficit disorder. Johnson testified that defendant also suffers from a borderline personality disorder and is antisocial. He recounted that defendant had acknowledged that his parole officer had warned him not to infect other people, and that defendant had responded that "he was going to do whatever he wanted, whenever he wanted." Johnson also thought that it was significant that defendant agreed to use, and in fact used, condoms when having intercourse with a woman for whom he expressed affection, but he did not use condoms with the other women with whom he had sex. Johnson also reported a conversation with another of defendant's former sexual partners, who said that, although defendant had denied that he was HIV-positive, he said that if he were positive, he would spread the virus to other people. In Johnson's opinion, such statements, coupled with defendant's behavior, showed intentional, deliberate conduct. Particularly in the light of the pattern of systematically recruiting and exploiting multiple partners over a long period of time, Johnson said, he found no evidence to suggest that defendant was acting impulsively or without the intent to harm.

Defendant moved for a judgment of acquittal, which the trial court denied. On appeal, defendant argues that the trial court erred in denying his motion, because the evidence is insufficient to support convictions for either attempted murder or attempted assault. He argues that there is no evidence that he intended to cause death or serious bodily injury, only evidence that — at most — he acted in reckless disregard of the consequences of his conduct. The state contends that the evidence is sufficient to support the convictions on both sets of charges, based on the undisputed evidence that defendant concealed or lied about his HIV status, refused to wear condoms, and intentionally had unprotected sex with a number of women, while fully aware of the fact that he was exposing them to the virus.

■ We review a denial of a motion for judgment of acquittal to determine whether, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Cervantes*, 319 Or at 125. We must give the state the benefit of all reasonable inferences that properly may be drawn. *Id.* A person is guilty of attempting to commit a crime

> "when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

ORS 161.405(1). A person commits assault in the first degree when

> "the person intentionally causes serious physical injury to another by means of a deadly or dangerous weapon."

ORS 163.185(1). A person commits attempted murder when he or she attempts, without justification or excuse, intentionally to cause the death of another human being. ORS 163.115; ORS 163.005. To act "intentionally" is to "act[] with a conscious objective to cause the result or to engage in the conduct so described." ORS 161.085(7).

■ Viewing the evidence in the light most favorable to the state, we conclude that there is sufficient evidence for a rational trier of fact to find that defendant intended to cause both physical injury and death. He knew that he was HIV positive and that his condition was terminal. He knew that if he transmitted the virus to another person, that person eventually would die as well. He understood that having unprotected sex would expose his sexual partners to the virus and that a single sexual encounter could transmit the virus. He had been told, and he acknowledged, that having unprotected sex and transmitting the disease was "murder." He even signed an agreement that he would refrain from any unsupervised contact with women without the approval of his probation officer.

In spite of that awareness, defendant engaged in a persistent pattern of recruiting sexual partners over a period of many months. He consistently concealed or lied about his HIV status. He refused to wear condoms, or pretended to wear them, penetrating women without protection and

against their protestations. He engaged in unprotected sex, including rough and violent intercourse, which increased the chances of passing the virus to his partners. He bragged about his sexual prowess, even after acknowledging his HIV status, and told at least one person that he intended to spread the disease to others by such conduct.

Defendant insists that he meant only to satisfy himself sexually, and that that is insufficient to prove intent to harm or to cause death. His conduct, however, demonstrates that his objective was more than mere sexual gratification. When he engaged in sexual intercourse with the woman he hoped to marry, he consistently wore condoms and made no attempt to conceal his HIV status. When he had sex with others, in contrast, he concealed or lied about his condition and refused any protection. Particularly in the light of the pattern of exploitation over a long period of time, a rational factfinder could conclude beyond a reasonable doubt that defendant did not act impulsively merely to satisfy his sexual desires, but instead acted deliberately to cause his victims serious bodily injury and death. The trial court did not err in denying defendant's motion for a judgment of acquittal.

Affirmed.