**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDREW LEE BOYER,
        *Petitioner-Appellant,*

v.

BRIAN BELLEQUE,
        *Respondent-Appellee.*

No. 10-35574

D.C. No.
3:06-cv-00035-PK

OPINION

Appeal from the United States District Court
for the District of Oregon
Malcolm F. Marsh, Senior District Judge, Presiding

Argued and Submitted
June 8, 2011—Portland, Oregon

Filed October 28, 2011

Before: Raymond C. Fisher, Ronald M. Gould, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Gould

19615

## COUNSEL

Tonia L. Moro, Assistant Federal Public Defender, Medford, Oregon, for the petitioner-appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and David B. Thompson, Assistant Attorney General, Salem, Oregon, for the defendant-appellee.

---

## OPINION

GOULD, Circuit Judge:

Oregon state prisoner Andrew Lee Boyer appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. He argues that the evidence presented was constitutionally insufficient for a rational jury to find him guilty of attempted aggravated murder beyond a reasonable doubt. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). Our review of the evidence convinces us that the prosecution presented evidence of specific intent to kill, as that element has been defined by Oregon state law and interpreted by the state appellate court. Accordingly, the state court's determination that there was sufficient evidence of Boyer's intent to support a conviction for attempted aggravated murder was an objectively reasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979). We affirm.

## I.  Factual and Procedural History

In 1997, a jury convicted Boyer of more than twenty counts of sexual offenses, including sexual abuse, sodomy, and attempted sodomy. Boyer was also convicted of two counts of attempted aggravated murder, based on the theory that, in the course of and in furtherance of the crimes of sexual abuse and sodomy, he attempted to cause the death of two individuals "by performing anal sodomy on the said [individuals], knowing that he . . . was infected with [AIDS[1]], a fatal disease that

---

[1]The acquired immune deficiency syndrome ("AIDS") is the final stage of human immunodeficiency virus ("HIV") infection. *See* AIDS, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001620/ (last visited October 20, 2011).

is transmitted to another person by the transfer of body fluids such as semen."[2] On appeal, Boyer challenges only the denial of habeas relief on the attempted aggravated murder convictions.

Because Boyer claims that the evidence presented at trial was constitutionally insufficient to support his attempted aggravated murder convictions, we review the evidence presented on those counts in detail. As is required of us on habeas review when assessing the sufficiency of the evidence of conviction, we view the evidence in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."); *see also Juan H. v. Allen*, 408 F.3d 1262, 1266 n.1 (9th Cir. 2005).

## A.    Evidence Presented at Trial

At trial, the State presented nineteen witnesses over several days. The evidence established that Boyer sexually abused four victims, through touching and oral sex, and that he also anally penetrated two of them. His victims were friends with one another, attended special education programs at school, and were incapable of consenting to sexual conduct due to age or mental defect. At the time of the abuse in 1996, victim B.B. was twelve years old, victims R.K. and G.T. were thirteen years old, and victim R.M. was an eighteen-year-old with the mental capacity of a first or second grader. Boyer was in his mid-thirties. Medical professionals testified about "grooming" techniques often employed by sexual abusers to gain vulnerable victims likely to succumb to the abuser's advances, and

---

[2]AIDS is not transmitted via the transfer of bodily fluids. Instead, HIV can be spread through bodily fluids, such as blood and semen, and later cause AIDS. *See* AIDS, *supra* n.1.

testimony showed that Boyer used such techniques in approaching his victims.

### 1. The Police Investigation

A transcript of Detective Baltzell's initial interview of Boyer, when Boyer was arrested, was admitted in evidence. Boyer then admitted to engaging in sexual activity with R.K., B.B., and R.M. but said it was consensual. Boyer denied having sexual intercourse with B.B. because "the kid was too little, I wouldn't even think about it." Boyer also said that he had AIDS and "[t]hat's why I'm particularly careful, would not sodomize anybody . . . ."

At trial, Detective Baltzell testified that he interviewed all four victims. Victim B.B. was reticent at first to tell Detective Baltzell of the abuse he had experienced but said that Boyer had anally penetrated B.B. without B.B.'s permission. B.B. also said that, after the anal intercourse occurred, Boyer ejaculated by masturbation and used a towel to clean up the semen. B.B. did not know if Boyer had ejaculated inside of him. Victim R.M. told Detective Baltzell that Boyer had threatened to kill him when R.M. said he wanted to tell the police about the abuse. After first denying that anal penetration had occurred, R.M. disclosed in an interview about two weeks before trial that he and Boyer had anal intercourse. On cross-examination, Detective Baltzell said that none of the victims claimed that Boyer ejaculated inside of them.

### 2. Evidence related to victim R.M.

Victim R.M. testified that Boyer performed oral sex on him many times and anally raped him on one occasion. R.M. said that he considered Boyer a friend and that R.M. would visit Boyer when bored. R.M. met Boyer through fellow victim R.K. Boyer offered R.M. marijuana and alcohol, but R.M. declined. R.M. went to Boyer's home, where Boyer showed him magazines, took R.M.'s pants off, and performed oral sex

on him. Boyer threatened to kill R.M., and later R.M.'s parents, if R.M. told anyone about the abuse. R.M. estimated that he visited Boyer's home about fifty times and that Boyer performed oral sex on him about twenty times in total. R.M. testified that, on one occasion when he and R.K. were spending the night at Boyer's apartment, Boyer anally penetrated R.M. R.M. described the encounter as a rape. R.M. told Boyer to "stop, please" and said "ouch" loudly enough to wake up R.K. R.M. testified that the anal penetration was painful, and that Boyer did not ejaculate while penetrating R.M. but instead ejaculated into the bed afterwards. Boyer did not wear a condom.

Though his account of the timing of the incident differed from that given by R.M., R.K. testified that, while sleeping at Boyer's home, he was awakened by a person he believed was R.M. saying "owe [sic], stop" and that R.M. later told R.K. that R.M. had been raped. Dr. George Suckow, a physician specializing in psychiatry who did a comprehensive psychiatric assessment on R.M., also testified, noting that R.M. said he had been involved, as the passive recipient, in anal intercourse and oral sex with Boyer. Victim G.T. also testified that Boyer had bragged about raping R.M.[3]

### 3.  Evidence related to victim B.B.

Victim B.B. testified that Boyer sexually abused him on two occasions. The first time, B.B. skipped school with fellow victim R.K., and they went to Boyer's home. Boyer gave them lunch and cigarettes. They watched television and looked at magazines about "[d]ifferent types of sex." B.B., Boyer, and R.K. masturbated, and all three went into the bedroom. Boyer unsuccessfully tried to have B.B. anally penetrate Boyer, and then Boyer performed oral and anal sex on B.B. B.B. testified that Boyer did not ask his permission to

---

[3]Victim G.T. testified that, in regard to R.M., Boyer stated, "I butt fucked him pretty good. It was pretty good."

engage in anal sex, that he did not know if Boyer ejaculated into him, and that there were no stains in B.B.'s underpants afterwards. B.B. also testified that the anal penetration was painful. R.K. testified that he witnessed Boyer performing oral and anal sex on B.B. B.B. testified that he went back to Boyer's apartment with R.K. a day or two later for the second and last time and that Boyer touched B.B.'s penis. R.K.'s testimony did not mention this incident.

Dr. Michael Lukschu testified that he conducted an examination and evaluation of B.B. for suspected child abuse and that B.B. disclosed that Boyer had penetrated his anus.

### 4.   Testimony by Boyer's treating physician

At trial, Dr. David Gilbert, Boyer's treating physician since January 1992, testified about Boyer's medical history and about HIV and AIDS generally. Dr. Gilbert stated that Boyer was first diagnosed with HIV around 1986 and that he had AIDS by July of 1993. Dr. Gilbert testified that in 1993, Boyer's prognosis was that he most likely had two more years to live. Boyer stopped complying with his drug treatment in July of 1996 and had a high blood viral count in early December of 1996.

Dr. Gilbert stated that HIV may be passed through bodily secretions, that there is a higher risk of transmission when the viral count in the blood is higher, and that "the two major modes of transmission are sexual activity and contaminated blood." Dr. Gilbert said that Boyer was given information that his viral count would go up if he did not take his medication, but Dr. Gilbert could not remember whether he told Boyer that the risk of infecting others would also be higher. He stated that he counseled Boyer in January of 1992 "regarding the need to use condoms and practice safe sex" and gave him some pamphlets on it. Dr. Gilbert testified that safe sex involved the use of condoms and that he would expect Boyer to know the dangers of unprotected anal intercourse.

When asked whether a person who was the recipient of anal sex by an HIV-positive person had a high risk of contracting the disease, Dr. Gilbert stated that "for each sexual exposure, there is somewhere between a one [in] a 100 and one in a 1,000 chance of acquiring the disease through that sort of activity." He testified that although the risk of infection would be lower during anal sex if no ejaculation occurred, "prior to ejaculation, there are secretions that come out of the penis that do have HIV in it [sic]. So you would be decreasing the amount, but not eliminating the risk entirely." He also stated that oral sex was a low-risk activity, and that he had provided such general information to Boyer before the sexual assaults.

### 5.   Other evidence

Boyer's journal was admitted into evidence. In parts of it from 1995 that were read aloud to the jury, Boyer acknowledged that he had been HIV-positive for ten years with full-blown AIDS for two and a half years. Boyer wrote that he hoped to volunteer time to other people with HIV, that he was scared when his T-cell count went down to fifty-one, and that "he [felt] an urge to get things taken care of." In his journal, Boyer also commented on the high number of deaths from AIDS as reflected in materials he viewed while visiting the Cascade AIDS project. Boyer wrote, "you have to try not to think about the deaths so much or you'll never get anything done in life," and "[t]he lower my T-cell count, the more I worry about every little ache and pain." R.M. and B.B. testified that Boyer never told them that he was sick or had AIDS. G.T. testified that Boyer said he had cancer and not AIDS.

### B.   Motion for Judgement of Acquittal

At the close of evidence, Boyer moved for a judgment of acquittal on the charges for the attempted murders of R.M. and B.B. He argued that, taking the evidence in the light most favorable to the State, the State had failed to prove the required intent element, having proved only recklessness.

The State opposed the motion, arguing:

> [T]he Defendant knowingly and deliberately inserted his penis in the rectum of these two individuals. And inserting bodily fluid from his penis into them, and [sic] thereby caused the AIDS virus to be placed inside each of these two children.
>
> This was a knowing act, a deliberate act. There was absolutely nothing more that he could do to prevent the death of these children if they contracted the AIDS virus.

The State analogized Boyer's actions to placing a time bomb in a city street and not knowing if someone would be there when it went off.

The trial court denied Boyer's motion on the ground that:

> Intent is a very difficult thing to prove at best. . . . [I]t is very rare anybody states expressly what their intentions were. And typically it has to be inferred from the evidence. . . . [G]iven the knowledge that is attributable to Mr. Boyer regarding his infectious disease, the jury could infer an intent here to cause the deaths.

Allowing the attempted murder counts to go to the jury, the judge instructed the jury that "[a] person acts intentionally or with intent when that person acts with a conscious objective, either, one, to cause a particular result, or two, to engage in particular conduct." He also stated that "Oregon law provides that a person commits the crime of Attempted Aggravated Murder if that person intentionally attempts to cause the death of another human being under or accompanied by certain

defined circumstance." The jury found Boyer guilty of both attempted aggravated murder counts.[4]

For all the crimes for which he was convicted, Boyer was sentenced to a total of 604 months, or just over fifty years.[5]

Boyer directly appealed his convictions on the ground, inter alia, that the evidence was legally insufficient to sustain a guilty verdict for attempted aggravated murder. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *State v. Boyer*, 9 P.3d 157 (Or. Ct. App. 2000), *rev. denied*, 18 P.3d 1099 (Or. 2000). Boyer then filed in federal court a petition for a writ of habeas corpus, which the district court rejected on the merits.

## II.  Standard of Review

We review the district court's decision to grant or deny a petition for writ of habeas corpus de novo. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). In assessing the legality of a state court conviction, we review the "last reasoned state court decision," which, in this case, was the trial court's

---

[4]The jury also found Boyer guilty of the attempted murder of B.B. for the same underlying conduct. The state court set aside this conviction prior to sentencing under the doctrine of merger.

[5]For his conviction for the attempted aggravated murder of R.M., Boyer received a sentence of 121 months' imprisonment. For his other offenses against R.M., Boyer was sentenced to one term of 75 months and one term of 31 months, to be served concurrently with the attempted aggravated murder sentence.

For his conviction for the attempted aggravated murder of B.B., Boyer received a sentence of 120 months' imprisonment. For his other offenses against B.B., Boyer was sentenced to three terms of 75 months and one term of 13 months, to be served concurrently with the attempted aggravated murder sentence.

The two attempted aggravated murder sentences were imposed consecutively and in addition to the sentences given for Boyer's crimes against other victims.

denial of Boyer's motion for judgment of acquittal on the attempted aggravated murder counts. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds," particularly where, as here, the petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Juan H.*, 408 F.3d at 1274. Under AEDPA, a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings" unless such adjudication resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

Boyer contends that the state court's decision involved an unreasonable application of federal law. A state court decision is an unreasonable application of Supreme Court precedent if the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000); *see Penry v. Johnson*, 532 U.S. 782, 792 (2001). "For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *Williams*, 529 U.S. at 410 (internal quotation marks omitted) (emphasis in original)). Under this highly deferential standard, the state court's decision must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Moreover, because Boyer bases his claim on insufficiency of the evidence, we will only grant relief if the state court's application of *Jackson* was "objectively unreasonable." *Juan H.*, 408 F.3d at 1275 n.13 (9th Cir. 2005). Under *Jackson*, a petitioner "is entitled to habeas corpus relief if it is found that

upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324. "The *Jackson* standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.' " *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 324 n.16).

Thus, when we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted. The *Jackson v. Virginia* standard is itself deferential, as it only permits relief when "no rational trier of fact" could have found the elements necessary for guilt satisfied beyond a reasonable doubt. *Jackson*, 443 U.S. at 324. AEDPA adds a second level of deference, as it is not enough if we conclude that we would have found the evidence insufficient or that we think the state court made a mistake. Rather, the state court's application of the *Jackson* standard must be "objectively unreasonable" to warrant habeas relief for a state prisoner. Stated another way, to grant relief, we must conclude that the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable.

To add perspective on the claim before us, we borrow a literary allusion. Boyer is certainly no innocent Edmond Dantès, wrongfully imprisoned, though innocent of crime, because of a conspiratorial prosecution with witnesses lying to advance their self interest.[6] Boyer is undoubtedly guilty of many heinous sexual offenses, and he does not here challenge those convictions. But still the question presented in his federal habeas petition is whether he was wrongly convicted of

---

[6]*See* Alexandre Dumas, *The Count of Monte Cristo* (Peter Washington trans., Everyman's Library 2009) (1844-45).

attempted aggravated murder and that question requires evaluating whether the evidence submitted to the jury was sufficient for it to find all elements of *that* crime, as it has been defined and interpreted by the state of Oregon, beyond a reasonable doubt. For among the hallmarks of the American judicial system is this premise: Even a bad person who has committed many crimes should not be imprisoned for a crime that he did not commit. With this in mind, we turn to a consideration of whether, under the restricting lenses of *Jackson* and of AEDPA, this appeal presents such a case.

### III.    Oregon's Law of Attempted Aggravated Murder

Boyer contends that his convictions for attempted aggravated murder violate due process because the prosecution's evidence did not prove a material element of the crime, namely that Boyer intended to cause the deaths of R.M. and B.B. The State argues that the state courts' determination that the evidence was sufficient to prove the crime of attempted aggravated murder under Oregon law is a state-law issue that is not reviewable in a federal habeas proceeding. This argument misapprehends the nature of our court's review for substantial evidence. We assess whether record evidence is so lacking that habeas relief is merited under *Jackson* "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. When assessing a petition for a writ of habeas corpus, we thus "look to [state] law only to establish the elements of [the crime] and then turn to the federal question of whether the [state] court was objectively unreasonable in concluding that sufficient evidence supported [its decision]." *Juan H.*, 408 F.3d at 1278 n.14. To accept the State's argument that sufficiency of the evidence is entirely a state law issue would nullify the federal constitutional prohibition against convicting persons absent proof of guilt beyond a reasonable doubt, a principle firmly established by the United States Supreme Court's precedent. *In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

AEDPA requires that we treat the decisions of state courts with deference, but it does not insulate them totally from our review when federal constitutional rights are implicated. The state of course is free to define the required elements of attempted murder in its state law. But once the state has spoken as to the required elements, the federal issue of sufficiency of evidence remains: Was the evidence sufficient for a rational jury to find each required element beyond a reasonable doubt? To answer this question, we look to Oregon's law of attempted aggravated murder to determine what the prosecution was required to prove, vis-à-vis intent, to convict Boyer for that crime.

**[1]** Boyer was charged with attempted aggravated murder pursuant to Oregon Revised Statutes § 163.095 (defining "Aggravated murder"), § 163.115 (defining "Murder"), and § 161.405 (defining "Attempt"). Under Oregon law, a person is "guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime." Or. Rev. Stat. § 161.405 (1996). "A person commits attempted murder when he or she attempts, without justification or excuse, intentionally to cause the death of another human being." *State v. Hinkhouse*, 912 P.2d 921, 924 (Or. Ct. App. 1996) (citing Or. Rev. Stat. § 163.115), *modified*, 915 P.2d 489 (Or. Ct. App. 1996), *review denied by* 925 P.2d 908 (Or. 1996).[7] Oregon law defines "intentionally" as "act[ing] with a conscious objective to cause the result or to engage in the conduct so

---

[7]Criminal homicide constitutes murder (1) "[w]hen it is committed intentionally;" (2) when it is committed in the course of an enumerated felony or attempted felony; or (3) "when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of" a person with certain statutorily defined characteristics. Or. Rev. Stat. § 163.115 (1996).

described." Or. Rev. Stat. § 161.085(7) (1996). Such action must be " 'strongly corroborative of the actor's criminal purpose.' " *See State v. Walters*, 804 P.2d 1164, 1167 (Or. 1991) (quoting Model Penal Code § 5.01(2)). Under Oregon law, one cannot attempt reckless murder; where a defendant engages in reckless conduct manifesting an extreme indifference to the value of human life but does not injure anyone, he may only be charged with reckless endangerment. *State v. Smith*, 534 P.2d 1180, 1182-84 (Or. Ct. App. 1975). Rather, Oregon's law of attempted murder requires an actual intent to cause a person's death. *See Hinkhouse*, 912 P.2d at 924.

**[2]** Thus, under Oregon law, the evidence presented in support of Boyer's attempted aggravated murder convictions is legally sufficient if, viewed in the light most favorable to the prosecution, it can support a finding that Boyer acted "with a conscious objective to cause" the death of R.M. and B.B. Or. Rev. Stat. § 161.085(7). We must deny Boyer's petition for the writ unless the state court's determination that a rational jury could find such intent was objectively unreasonable.

## IV.  Sufficiency of the Evidence

**[3]** A state is generally free to define the elements of attempted murder as an offense under state law. *See Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) ("While a state is generally free within broad limits to define the elements of a particular offense, once it has defined them, due process requires that the jury be instructed on each element and find each element beyond a reasonable doubt before it can convict." (citing *Winship*, 397 U.S. at 364)). Here, Oregon has said that attempted murder requires the element of intent to kill. In *Hinkhouse*, a case involving attempted murder through the risk of transmission of HIV, the Oregon Court of Appeals held that repeated unprotected sex by a person knowing he had AIDS was sufficient to satisfy the intent element. 912 P.2d at 924-25 (Or. Ct. App. 1996). The Oregon State Supreme Court denied review in *Hinkhouse*, and to our

knowledge has decided no case to the contrary. It appears then that the Oregon law on sufficiency of evidence to show intent for an attempted murder charge related to HIV transmission remains where the Oregon Court of Appeals left it in *Hinkhouse*.

**[4]** *Hinkhouse*, in our view, clearly establishes the principle that a person with AIDS having unprotected sex with others, knowing that the disease could spread this way, and knowing it could be fatal, can be held to have satisfied the Oregon substantive element of intent for an attempted murder charge. We cannot say such a conclusion is wholly irrational, for the question is simply whether a rational jury in these circumstances could find an intent to kill beyond a reasonable doubt. The issue is not so much what Boyer subjectively intended in fact, but what a rational jury could have concluded he intended. Boyer's challenge to sufficiency of the evidence largely boils down to whether his case is sufficiently different from *Hinkhouse* to say that the intent element was not satisfied by adequate evidence. We will first assess whether Boyer's case is fairly distinguishable from that of Hinkhouse. If it is not, we will further assess whether we are in a position to say that the *Hinkhouse* court's conclusion was an objectively unreasonable application of *Jackson* such that a rational jury in these circumstances could not find intent to kill beyond a reasonable doubt.

### A. Boyer's case is not fairly distinguishable from *Hinkhouse*.

In *Hinkhouse*, the state appellate court found that the following was "sufficient evidence for a rational trier of fact to find that defendant intended to cause both physical injury and death":

> [Hinkhouse] knew that he was HIV positive and that his condition was terminal. He knew that if he transmitted the virus to another person, that person even-

tually would die as well. He understood that having unprotected sex would expose his sexual partners to the virus and that a single sexual encounter could transmit the virus. . . .

In spite of that awareness, [Hinkhouse] engaged in a persistent pattern of recruiting sexual partners over a period of many months. He consistently concealed or lied about his HIV status. He refused to wear condoms, or pretended to wear them, penetrating women without protection and against their protestations. He engaged in unprotected sex, including rough and violent intercourse, which increased the chances of passing the virus to his partners. He bragged about his sexual prowess, even after acknowledging his HIV status . . .

Particularly in the light of the pattern of exploitation over a long period of time, a rational fact finder could conclude beyond a reasonable doubt that defendant did not act impulsively merely to satisfy his sexual desires, but instead acted deliberately to cause his victims serious bodily injury and death. *Hinkhouse*, 912 P.2d at 924-25.[8]

[5] The record here contains similar facts to those that the Oregon Court of Appeals found sustained the conviction for attempted murder in *Hinkhouse*. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have concluded that Boyer knew that he had developed full-

---

[8]The state appellate court initially considered evidence that Hinkhouse expressly stated that he intended to transmit the disease through his conduct. *Hinkhouse*, 912 P.2d at 925. Upon reconsideration, the state appellate court affirmed the conviction, stating that even assuming consideration of this statement should be precluded, "the evidence . . . [was] sufficient to enable a jury to conclude, beyond a reasonable doubt, that [Hinkhouse] intended to cause serious bodily injury and death." *Hinkhouse*, 915 P.2d at 490.

blown AIDS by 1993 and he believed his condition to be terminal; Boyer understood that he could transmit the disease through even a single instance of unprotected sex, regardless of whether or not he ejaculated, and his partner consequently could develop AIDS and die as a result; Boyer targeted extremely vulnerable victims, indeed children, over a period of several months, through deliberate "grooming" and predatory activities; Boyer sexually abused B.B. and R.M., anally penetrating each of them once without a condom, despite knowing that he had full-blown AIDS; Boyer concealed from his victims and lied to his victims about the fact that he had AIDS; when Boyer raped R.M. and had anal sex with B.B., he knew his viral count was high, which increased the likelihood of transmission; Boyer's sexual encounters with his victims were rough and violent, as he raped R.M., and his anal penetration of B.B. was painful; and Boyer bragged about raping R.M.

**[6]** The facts here are strikingly similar to those recognized in *Hinkhouse* as probative of intent. Accordingly, we do not think that Boyer's case can be fairly distinguished from the facts of Hinkhouse. If there was sufficient evidence to sustain the element of intent to kill in Hinkhouse's attempted murder conviction, then we conclude that there was also adequate evidence to sustain that of Boyer under Oregon law.

### B. We are not in a position to say that *Hinkhouse* was wrongly decided.

There remains the question whether, despite the similarity of this case to *Hinkhouse*, the United States Supreme Court could take the view that the evidence determined to be sufficient in *Hinkhouse*, and the similar evidence here, is inadequate as a matter of federal constitutional law to show intent to kill. Yet this is a case under AEDPA, and we cannot grant relief unless we conclude that Oregon's application of *Jackson v. Virginia*, deciding the evidence here was sufficient for a rational jury to find guilt on the intent element beyond a rea-

sonable doubt, is an objectively unreasonable application of Supreme Court precedent. We are unaware of any Supreme Court case suggesting that intent to kill could not be determined by a rational jury from the factual circumstances set forth above, involving repeated unprotected sex by a person knowing that he had AIDS and that its transmission could be fatal. Accordingly, we cannot determine without more that the state has unreasonably applied *Jackson*.

**[7]** We conclude that the state courts' application of *Jackson v. Virginia* was not objectively unreasonable. *See Harrington*, 131 S. Ct. at 785. It was not unreasonable, in the light of *Hinkhouse*, to conclude that a rational jury could find beyond a reasonable doubt that Boyer intended to kill his victims based on proof that he anally penetrated several victims with knowledge that he could infect them with AIDS.

That intent to kill is the required *mens rea* for the crime of attempted murder is basic to our criminal law:

> [O]n a charge of attempted murder it is not sufficient to show that the defendant intended to do serious bodily harm, that he acted in reckless disregard for human life, or that he was committing a dangerous felony. Again, this is because intent is needed for the crime of attempt, so that attempted murder requires an attempt to bring about that result described by the crime of murder (i.e., the death of another).

*See* Wayne R. LaFave, *Substantive Criminal Law* § 11.3(a) (2d ed. 2003). The Oregon criminal code likewise separately defines "[i]ntentionally," "[k]nowingly," and "[r]ecklessly," Or. Rev. Stat. § 161.085(7), (8), (9), and conviction in Oregon for attempted murder requires proof of the defendant's intent to cause the death of his victims, *Hinkhouse*, 912 P.2d at 924. But the problem in this case for Boyer, a problem compounded by the *Hinkhouse* precedent, is that the state appellate court concluded that the evidence in this case supported

a rational inference of intent to kill. Although the United States Supreme Court would be free to issue a new precedent giving relief to Boyer on his theory, the constraints of AEDPA preclude our doing so.

## V.   Conclusion

**[8]** With some reluctance because of the thin nature of the evidence of intent, but concluding that state courts have a broad general entitlement to deference to define their own state criminal law and that this case cannot be fairly distinguished from *Hinkhouse*, we conclude that the state courts' determination that sufficient evidence existed to support Boyer's convictions for attempted aggravated murder was not objectively unreasonable, and habeas relief is not warranted.

**AFFIRMED.**