# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2886

_____

United States of America,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　Plaintiff-Appellee,　　　*
　　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
David Ruiz Singh,　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　Defendant-Appellant.　　*


_____

No. 06-3056

_____

Appeals from the United States
District Court for the Southern
District of Iowa.

United States of America,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　Plaintiff-Appellee,　　　*
　　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　*
Martin Ruiz Singh,　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　Defendant-Appellant.　　*

_____

Submitted: April 10, 2007
Filed: July 13, 2007

_____

Before MELLOY, BOWMAN, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Defendants David Ruiz Singh ("David") and Martin Ruiz Singh ("Martin") were convicted by a jury of distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1), and conspiring to distribute in excess of 500 grams of methamphetamine in violation of 21 U.S.C. § 846. Martin was also convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Both defendants argue that the district court permitted the introduction of inadmissible hearsay testimony over their objections and in violation of the Confrontation Clause of the Sixth Amendment. They also argue that the evidence was insufficient to support their convictions. Because we find that the admission of hearsay testimony was harmless and not in violation of the Confrontation Clause, and because there was sufficient evidence to support the convictions, we affirm.

I. Background

Martin and David are brothers who were involved in the distribution of methamphetamine in and around Marshalltown, Iowa, from 1998 through 2004. Martin worked at a meat packing plant where he conducted a part of his drug trade and cultivated contacts for buying and selling pound quantities of methamphetamine. David served the role of enforcer and money collector for the conspiracy. David also sold smaller, user-quantities of methamphetamine. The brothers were convicted following a joint trial in which numerous co-conspirators and several police officers testified. We describe the evidence and testimony introduced against the two men, and objections to the evidence, as relevant to the present appeal.

The first prosecution witness was Todd Parrish, a deputy in the Marshall County Sheriff's Office. Deputy Parrish testified that he was involved in the preparation, surveillance, and follow-up activities surrounding a number of controlled buys, controlled deliveries, and contacts between Martin and a cooperating co-

-2-

conspirator, Mark Carnahan. Deputy Parrish did not physically observe the interactions between Carnahan and Martin, but he listened to and/or recorded their conversations from a nearby location. Through his testimony, Deputy Parrish provided context that helped to corroborate subsequent testimony by Carnahan regarding the encounters. The controlled encounters took place at David's residence and at the meat packing plant.

The next witness, Detective Burt Tecklenburg of the Marshall County Sheriff's Office, was the lead detective on the case. Det. Tecklenburg testified three times during the trial: he testified before and after cooperating co-conspirator Carnahan, and he testified as a rebuttal witness after the defense rested its case. In his initial testimony, Det. Tecklenburg explained his background and introduced a series of recordings from controlled transactions and encounters involving Carnahan and Martin.

Carnahan was the next government witness and the central witness to the government's case. Carnahan testified that he met Martin at the meat packing plant where Martin was a supervisor. Carnahan learned that Martin was selling methamphetamine, and Carnahan soon began receiving methamphetamine from Martin on credit. Carnahan sold between seven and ten pounds of methamphetamine for Martin between 1998 and 1999 or 2000. Martin stopped selling to Carnahan at that time because Carnahan fell behind on payments to Martin. In 2002, after a replacement seller for Martin lost his job at the meat packing plant, Martin returned to using Carnahan to sell methamphetamine. In the 2002-2003 timeframe, Carnahan sold an additional five to seven pounds of methamphetamine for Martin.

In addition, Carnahan testified that on at least two occasions, he arranged with Martin to obtain ounce quantities of methamphetamine from David at David's residence and, in fact, met with and received the methamphetamine from David. In addition, on at least one occasion, David came to Carnahan's home to demand the

payment of $900 that Carnahan owed to Martin. David pushed Carnahan down a hallway and told Carnahan to come up with the $900 or he would take Carnahan's car. Also, over the objection of defense counsel, Carnahan testified that Martin told him David was the money collector or "muscle" for the brothers' drug-dealing activity.

Carnahan then explained his involvement in several controlled phone calls, money deliveries, and drug transactions that Deputy Parrish and/or Det. Tecklenburg had described. Carnahan described a first controlled purchase in which he called Martin to arrange a buy, Martin instructed him to come to David's residence, and Carnahan went to David's residence. At David's residence, Martin gave Carnahan two ounces of methamphetamine for $1800. Carnahan testified that David was present for the transaction and that David told Carnahan to "stay a little bit longer because a white person coming to a Mexican's house, that doesn't look good."

Carnahan next described a controlled delivery of $900 to David to pay the debt to Martin, as referenced above. Carnahan received $900 from Det. Tecklenburg and paid the money to David at David's residence. Carnahan testified that David told him to stop delivering drugs to people on credit and to start demanding cash at the time of delivery to avoid falling behind on his own payments.

Carnahan also testified about additional controlled encounters with Martin and David at David's residence. In one instance, Carnahan again purchased two ounces of methamphetamine for $1800 and sought to introduce an undercover agent to Martin. Martin refused to permit Carnahan to bring in the new person on that occasion. David was present during that transaction but did not actively participate. On another occasion, Carnahan was to receive methamphetamine from Martin at the meat packing plant, but Martin pre-empted the workplace delivery by arriving unannounced at Carnahan's apartment and delivering the drugs. The final controlled transaction involving Carnahan was a purchase of one ounce of methamphetamine from Martin in the employees' locker room at the meat packing plant.

Officers had made audio tapes of the controlled transactions, and the tapes, where audible, corroborated Carnahan's descriptions of the encounters. The tapes were played in court, and Carnahan identified David and Martin's voices on the recording from one of the controlled transactions. Carnahan then identified Martin's voice on tapes from three different transactions. In order to explain comments on one of the tapes regarding transactions that preceded Carnahan's cooperation with law enforcement officials, Carnahan testified that he had been involved in pound-quantity methamphetamine transactions with Martin.

Regarding credibility issues, Carnahan stated that he had been convicted of drug-related state felonies and that, at the time he commenced his cooperation with Det. Tecklenburg, he faced the possibility of federal charges that would have carried a twenty-year mandatory minimum sentence and possible life imprisonment. He admitted that he used methamphetamine while assisting Det. Tecklenburg. He also stated that he initially cooperated with Det. Tecklenburg for money rather than for assistance in avoiding prosecution, but he later cooperated to avoid prosecution.

Det. Tecklenburg then returned to the stand and testified as to his own role in the investigation. He provided context for much of Carnahan's testimony. Over objections, Det. Tecklenburg testified regarding out-of-court statements Carnahan had made in which Carnahan described David's statements implicating Martin in the conspiracy and in which Carnahan described the encounter with David involving intimidation related to the $900 debt to Martin. This testimony from Det. Tecklenburg mirrored the testimony that Carnahan himself provided.

Diane Pieters testified next. Pieters was a methamphetamine user who obtained user-quantities of methamphetamine directly from David and from David through other people on approximately forty occasions. At one point in her testimony, she stated that another methamphetamine user, Henry Segovia, obtained methamphetamine for her *from* David. Defense counsel objected, and the district

court overruled the objection based on the district court's belief that Pieters had said Segovia obtained the methamphetamine *for* David. Another methamphetamine user, Christine Torres, testified that she purchased user quantities of methamphetamine from David on over twenty occasions.

In addition, co-conspirators Jose Luis Delgado Benitez and Esequiel Gallardo testified. Benitez testified that he met Martin when he and Martin worked together at the meat packing plant. Benitez purchased pound quantities of methamphetamine from Martin and, over objection, said that Martin described having a brother from California who was in Marshalltown and who collected a debt for him. Gallardo also met Martin when working at the meat packing plant. Gallardo sold approximately twenty-five pounds of marijuana to Martin and approximately eight pounds of methamphetamine. Gallardo testified over objection that Martin told him to deal with David if he ever needed anything or needed to drop anything off. Gallardo did not state that he ever actually bought methamphetamine from, or sold methamphetamine to, David.

Additional officers testified as to their roles in the preparation and execution of the controlled transactions and the execution of search warrants. At Martin's residence, officers found a digital scale in the kitchen and $472 in cash on Martin's person. One of the bills contained a white powdery substance consistent with methamphetamine.

Finally, a Marshalltown police officer, Todd Tuttle, described a traffic stop involving David that took place during the window of time that Carnahan was cooperating with investigators. Officer Tuttle saw David driving a vehicle with overly tinted windows, recognized David, and knew that David was driving in violation of a suspended license. Officer Tuttle activated his lights, and David failed to stop. Officer Tuttle then activated his siren and David stopped. When Officer Tuttle exited his car to approach David's vehicle, David drove away. Officer Tuttle returned to his

car, pursued David, and David stopped his vehicle again. Officer Tuttle again approached David's vehicle and ordered David to exit the vehicle. David then attempted to drive away and Officer Tuttle, who was hanging onto David's door, was dragged a short distance. David then exited his vehicle and refused to obey Officer Tuttle's commands. Officer Tuttle used mace on David, but David remained uncooperative and physically resisted Officer Tuttle. Ultimately, Officer Tuttle discharged his mace at David eight times and took him into custody. A search of David's vehicle revealed 2.2 grams of methamphetamine in the glove box.

## II. Discussion

### A. Confrontation Clause Challenges

Martin and David argue that it was error to admit testimony from Carnahan, Gallardo, and Delgado-Benitez regarding incriminating statements that David made about Martin and Martin made about David. They characterize the testimony from these witnesses as describing out-of-court statements by non-testifying co-defendants that should have been excluded under Bruton v. United States, 391 U.S. 123, 137 (1968), and that were admitted in violation of each defendant's right to cross-examine witnesses as guaranteed by the Confrontation Clause of the Sixth Amendment. The district court conditionally admitted the challenged testimony from these witnesses' regarding Martin's and David's statements under Federal Rule of Evidence 801(d)(2)(E) as statements by co-conspirators made in the course of, and in furtherance of, the conspiracy. In accordance with the procedure set forth in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978), the district court subsequently determined that the government established the existence of a conspiracy by a preponderance of independent evidence. Based on this determination, the district court allowed the challenged testimony to stand.

<u>Bruton</u> held generally that the admission of an incriminating statement by non-testifying co-defendant at a joint trial violates the defendant's rights under the Confrontation Clause. <u>Bruton</u>, 391 U.S. at 137. <u>Bruton</u>, however, does not preclude the admission of otherwise admissible statements by a co-conspirator under Rule 801(d)(2)(E). <u>See</u> <u>United States v. Mickelson</u>, 378 F.3d 810, 819 (8th Cir. 2004) ("However, when the statements are those of a co-conspirator and are admissible under Federal Rule of Evidence 801(d)(2)(E), the Sixth Amendment and <u>Bruton</u> are not implicated."). Further, our court has held that co-conspirators' statements made in furtherance of a conspiracy and admitted under Rule 801(d)(2)(E) are generally non-testimonial and, therefore, do not violate the Confrontation Clause as interpreted by the Supreme Court. <u>See</u> <u>Crawford v. Washington</u>, 541 U.S. 36, 51-54 (2004) (providing examples of statements that are testimonial in nature); <u>see also</u> <u>United States v. Lee</u>, 374 F.3d 637, 644 (8th Cir. 2004) (applying <u>Crawford</u> and stating, "In contrast to these examples, casual statements to an acquaintance are not testimonial. Nor are statements to a coconspirator or business records testimonial.") (internal citation omitted). In the circumstances of the present case, we believe that the district court properly admitted the challenged testimony under Rule 801(d)(2)(E) and that the co-defendants' out-of-courts statements were not testimonial. Accordingly, there was no violation of the Confrontation Clause and no error in the admission of the challenged testimony.

### B. Other Hearsay Objections

Martin and David challenge as inadmissible hearsay the testimony from Det. Tecklenburg in which Det. Tecklenburg relayed Carnahan's prior, out-of-court description of interactions with David. They also challenge the admission of the statement by Pieters that Henry Segovia obtained methamphetamine "from" David. We believe that these challenges have merit.

Carnahan's statement to Det. Tecklenburg was an out-of-court statement "offered in evidence to prove the truth of the matter asserted," i.e. that David was involved in the conspiracy and served in the role of money collector or "muscle" for Martin. Fed. R Evid. 801(c). David made a timely objection to the admission of this aspect of Det. Tecklenburg's testimony, and we find no applicable exclusion to the hearsay definition nor exception to the general rule of inadmissibility that would permit Det. Tecklenburg's testimony. Carnahan was a cooperating informant and his statement to Det. Tecklenburg was made in that capacity, not in the capacity of co-conspirator and not in furtherance of the conspiracy. See United States v. Alonzo, 991 F.2d 1422, 1425-26 (8th Cir. 1993) (holding that statements by a cooperating co-conspirator to known authorities, made after the commencement of cooperation, are not admissible under Rule 801(d)(2)(E) because such statements are not made "in furtherance of the conspiracy").

Also, it is not clear that Pieters's testimony regarding an incriminating, out-of-court statement by Henry Segovia identifying David as a supplier of methamphetamine was admissible. While Segovia may have been a co-conspirator within the meaning of Rule 801(d)(2)(E), Pieters's testimony relaying Segovia's statement about David was not admitted under this rule. The district court overruled defense counsel's objection to Pieters's testimony based on the understanding that Pieters had said Segovia obtained methamphetamine *for* David. The transcript of the trial indicates that Pieters actually testified that Segovia claimed to have obtained the methamphetamine *from* David. This distinction, while subtle, arguably changes the impact of the statement from one suggesting David was a user of methamphetamine to one identifying David as a supplier. It is not entirely clear, however, that this distinction impacts admissibility. Regardless, we need not dwell on this point further; if there was error in the admission of Pieters's testimony, any such error was harmless.

Error in the admission of evidence only provides a basis for relief if the error affected the defendants' "substantial rights." Fed. R. Crim. P. 52(a); see United States

v. Sanchez-Godinez, 444 F.3d 957, 961 (8th Cir. 2006) ("An evidentiary error is harmless if the substantial rights of the defendant were unaffected and the error did not influence or had only a slight influence on the verdict.") (citation and internal quotation marks omitted). Det. Tecklenburg's hearsay testimony was arguably harmful because it buttressed Carnahan's credibility by showing that Carnahan had made an earlier, consistent out-of-court statement to Det. Tecklenburg that was identical or similar to his trial testimony. David accurately characterizes Carnahan as an important government witness at the center of the case and argues that the improper buttressing of Carnahan's credibility must have impacted the jury's deliberations.

Although David presents a logical chain of reasoning that sets forth a cogent theory to explain how the hearsay could have been prejudicial, we must view the evidentiary error in light of the record as a whole. Here, a great deal of properly admitted testimony and evidence buttressed Carnahan's credibility and provided context for the controlled transactions. The audio tapes played in court and the testimony of other conspirators strongly corroborated Carnahan's testimony. Properly admitted testimony from officers provided context and explained the controlled transactions. Against this backdrop, we do not find that the incremental buttressing of Carnahan's credibility by the admission of hearsay through Det. Tecklenburg affected David's "substantial rights." Fed. R. Crim. Pro. 52(a). Also, given the ample evidence demonstrating David's involvement in the conspiracy and detailing his repeated provision of user-quantities of methamphetamine to Pieters and Torres, the challenged testimony describing a single incident involving Henry Segovia had, at most, a *de minimis* impact.

## C. Sufficiency of the Evidence

In addition, we find the evidence and testimony, as set forth above, sufficient to support the defendants' convictions. Both defendants argue the evidence was insufficient to establish beyond a reasonable doubt that the amount of

methamphetamine involved in the conspiracy and attributable to each defendant was greater than 500 grams. Although the controlled transactions involving Carnahan did not involve 500 or more grams of methamphetamine, multiple co-conspirators—Carnahan, Benitez, and Gallardo—testified as to their own personal involvement in the conspiracy. Each of these witnesses testified as to transactions with Martin involving methamphetamine in amounts in excess of 500 grams. The evidence as described herein is sufficient to support the jury's determination that David, as well as Martin, participated in the conspiracy to distribute in excess of 500 grams of methamphetamine. To the extent the defendants base their challenges on the jury's credibility determinations, such determinations are "virtually unreviewable" on appeal, and we will not disturb the jury's assessment in this case. United States v. Davis, 471 F.3d 938, 948 (8th Cir. 2006) (quotation marks omitted).

The judgments of the district court are affirmed.

_____