# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3539

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Francisca Avila Vargas, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 13, 2009
Filed: July 6, 2009

_____

Before WOLLMAN, RILEY, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Francisca Avila Vargas was convicted of conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846; distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and engaging in a continuing criminal enterprise, in which she supervised at least five people and distributed at least 15,000 grams of methamphetamine mixture, in violation of 21 U.S.C. § 848(a), (b)(1), (b)(2)(A). The district court[1] sentenced Vargas to life imprisonment, the mandatory sentence for her role and the drug quantity

_____

[1] The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota

involved in the continuing criminal enterprise.  Id.  Vargas appeals, arguing that the evidence was insufficient to support the finding that the criminal enterprise involved more than 15,000 grams of a methamphetamine mixture and that the district court erred in joining her trial with that of her co-defendant, Miguel Garcia.  We affirm.

I.

After Vargas and Garcia were indicted, the government moved to consolidate their trials.  Because Vargas distributed methamphetamine for resale and Garcia redistributed the drug on behalf of Vargas, much of the evidence overlapped.  Vargas objected to joinder because a statement by Garcia could be used against her at trial and she would not have the opportunity to cross examine Garcia.  The district court determined that there would be no violation of Vargas's Sixth Amendment right to confront a witness so long as Vargas's name was redacted from the document at issue and a cautionary jury instruction was given.  The joinder motion was granted, and the case proceeded to trial.

During the seven-day jury trial, several of Vargas's coconspirators testified against her, including Andy Mata, a longtime friend of Vargas and Garcia.  Mata testified that he sold one pound of methamphetamine for Vargas in February 2004.

Daniel McCracken testified that he met Vargas in March or April 2004 and began selling marijuana for her.  Greater profits could be reaped from the sale of methamphetamine, however, and he later began to distribute methamphetamine for Vargas.  McCracken was a middleman and the leader of the Fargo, North Dakota, branch of the drug ring.  He worked with several dealers and his cousin, Kelly McCracken (Kelly), who had his own distribution network.

In the summer of 2004, Daniel McCracken moved to Vargas's home in St. Paul, Minnesota, after Kelly had become violent, potentially drawing the attention of law

enforcement officials in Fargo.  McCracken continued to manage the Fargo branch from St. Paul, coordinating with Vargas and her couriers to ship drugs to Kelly. McCracken estimated that he and Kelly moved sixteen pounds of methamphetamine for Vargas, ten pounds while McCracken lived in Fargo and another six pounds after he moved to St. Paul.  McCracken also testified that he met other distributors for Vargas, including Mark Crompton and Shane Gladeu, and that the total amount of methamphetamine he saw Vargas deal was between twenty-five and thirty pounds. "It could be more, wasn't less."

Shane Gladeu met Vargas through his sister, who was dating Vargas's son, in the spring of 2004.  Gladeu was addicted to methamphetamine, and he began buying the drug from Vargas to feed his own addiction and to distribute it in the Grand Forks, North Dakota, area.  When asked for a conservative estimate of the amount of methamphetamine Gladeu received from Vargas or her couriers, Gladeu answered "around seven pounds, eight pounds."

McCracken testified that he had met Gladeu a few times.  Once, at Gladeu's home in Crookston, McCracken saw Vargas provide Gladeu with a small amount of methamphetamine.  The men also met once in a parking lot in Fargo, where Gladeu had two pounds of methamphetamine from Vargas, one of which he delivered to McCracken.

In 2003, Mark Crompton met Garcia and started buying methamphetamine from him.  Every week for six months, Crompton bought an eighth of an ounce of methamphetamine from Garcia, using some and selling some in the Fargo-Moorhead area.  He later bought larger quantities, often selling the drug to Kathleen Matuska. Crompton testified that Garcia had provided him with two pounds of methamphetamine before Garcia was arrested in September 2004.  Crompton also testified that Garcia introduced him to Vargas, whom he identified as his source. After Garcia's arrest, Crompton received "a good two pounds" directly from Vargas.

Crompton did not know the other people who were dealing for Vargas, but he had met McCracken. McCracken testified that he was usually with Vargas when she distributed drugs to Crompton.

In December 2004, Vargas called Kathleen Matuska looking for Crompton, and the two women met to look for him in the Fargo area. That night, Vargas fronted Matuska an ounce of methamphetamine, which Matuska sold. After Matuska paid for the ounce, Vargas fronted her a pound. By the time Matuska was arrested, she had sold more than three pounds of methamphetamine that she received from Vargas.

The jury found Vargas guilty of all counts. In a special interrogatory, the jury found that the quantity involved in the continuing criminal enterprise was 15,000 grams or more and that Vargas had supervised eight coconspirators, including McCracken, Gladeu, and Crompton. As recounted above, the district court sentenced Vargas to life imprisonment, the statutory mandatory term for her role as a supervisor in a continuing criminal enterprise involving at least 15,000 grams of methamphetamine.

## II.

Vargas contends that insufficient evidence supported the jury's finding that the criminal enterprise involved at least 15,000 grams of methamphetamine. She argues that the jury must have relied on McCracken's testimony to reach that amount and that doing so resulted in double counting.[2]

---

[2]Both Vargas and the government have briefed this as an appeal from a jury verdict, arguing that we should view the evidence in the light most favorable to the verdict. The district court, however, was not required to submit a drug quantity special interrogatory to the jury because Vargas's life sentence did not exceed the statutory maximum prescribed for a conviction of engaging in a continuing criminal enterprise. See United States v. Jackson, 345 F.3d 638, 647 (8th Cir. 2003) (concluding that although the district court was not required to submit the principal

-4-

The coconspirators testified that Vargas distributed the following amounts of methamphetamine: Mata received one pound; Gladeu received seven to eight pounds; Crompton received two pounds from Vargas and two pounds from Garcia; Matuska received three pounds. McCracken testified that he had observed Vargas deal twenty-five or thirty pounds of methamphetamine:

> Q:     Now, in addition to the 16 pounds you described that you and Kelly moved, how much total would you estimate that you and Kelly moved along with the transactions that you observed with Cynthia, Gladeu, Crompton, and Jake?
>
> A:     25, 30 pounds.

McCracken's testimony included amounts from Gladeu and Crompton. As recounted above, McCracken had met Gladeu only three times and had observed Gladeu with two pounds of methamphetamine from Vargas. McCracken also testified that he was usually present when Vargas provided methamphetamine to Crompton. Accordingly, four pounds must be subtracted to avoid double-counting.[3] The total drug quantity

---

organizer and drug quantity special interrogatories to the jury, it did not err in doing so); United States v. Webb, 545 F.3d 673, 677 (8th Cir. 2008) ("[A] district court may impose a sentence based on a drug quantity determination greater than that found by the jury so long as the sentence does not exceed the statutory maximum of the convicted offense and the district court's calculation is supported by sufficient evidence.); see also 21 U.S.C. § 848(a) (setting the statutory range for the crime of continuing criminal enterprise from twenty years to life imprisonment); § 848(b) (mandating life imprisonment for principal administrator, organizer, or leader of enterprise involving at least 300 times the quantity of a substance described in § 841(b)(1)(B)). The standard of review we apply is not determinative of the outcome of this case and the evidence is sufficient to support the quantity determination.

[3] Vargas does not challenge the two pounds that Garcia provided to Crompton.

-5-

range, then, is thirty-six to forty-two pounds or 16,329.3 to 19,050.9 grams of methamphetamine.[4]

| Coconspirator | Drug Quantity in Pounds | Drug Quantity in Grams |
|---|---|---|
| Mata | 1 | 453.6 |
| McCracken | 25-30 | 11,339.8 - 13,607.8 |
| Gladeu | 7-8 | 3175.1 - 3628.7 |
| Crompton | 4 | 1814.4 |
| Matuska | 3 | 1360.8 |
| **Subtotal** | 40-46 | 18,143.7 - 20,865.2 |
| Less Amounts Observed by McCracken | -2 (Gladeu) -2 (Crompton) | -907.2 -907.2 |
| **Total** | 36-42 | 16,329.3 - 19,050.9 |

Having carefully reviewed the record, we conclude that the evidence is sufficient to support the drug quantity determination.

---

[4]Other witnesses testified regarding methamphetamine that they received from Vargas, and law enforcement officials testified regarding amounts seized from Vargas and Garcia. Because these amounts were less than one pound and not essential to the finding that the continuing criminal enterprise involved more than 15,000 grams of methamphetamine, we have not recounted their testimony in this opinion.

III.

Vargas contends that the joinder of her trial with Garcia's resulted in prejudice. Specifically, she argues (1) that Crompton's testimony identifying Vargas as Garcia's source violated her Sixth Amendment confrontation clause rights under Bruton v. United States, 391 U.S. 123 (1968), because she had no opportunity to cross examine Garcia and (2) that she was prejudiced when witnesses testified against Garcia with no reference to Vargas because it affected the jury's ability to separate the evidence for each of the defendants.

A.

In Bruton v. United States, the Supreme Court held that the admission of a non-testifying defendant's statement that incriminated a co-defendant violated the latter's confrontation clause rights. 391 U.S. at 135-36. Bruton, however, does not preclude the admission of statements by a coconspirator in furtherance of the conspiracy. United States v. Spotted Elk, 548 F.3d 641, 662 (8th Cir. 2008); United States v. Singh, 494 F.3d 653, 658-59 (8th Cir. 2007); see also United States v. Coco, 926 F.2d 759, 761 (8th Cir. 1991). Such statements are generally admissible absent confrontation because they are not testimonial. Spotted Elk, 548 F.3d at 662; Singh, 494 F.3d at 658-59; see also Crawford v. Washington, 541 U.S. 36, 56 (2004) ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy."). Under Crawford v. Washington, the confrontation clause has no application to out-of-court non-testimonial statements. Whorton v. Bockting, 549 U.S. 406, 420 (2007); Spotted Elk, 548 F.3d at 662; see also Melendez-Diaz v. Mass., No. 07-591, 2009 WL 1789486, at *11 (June 25, 2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because . . . they are not testimonial."). Garcia's statement identifying Vargas as his source was not testimonial and thus did not

implicate Vargas's Sixth Amendment confrontation clause right. We find no <u>Bruton</u> error.[5]

B.

Vargas has failed to show that the joinder of her trial with Garcia's resulted in prejudice. "Misjoinder requires reversal only if it resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." <u>United States v. Liveoak</u>, 377 F.3d 859, 864 (8th Cir. 2004) (quoting <u>United States v. Sazenski</u>, 833 F.2d 741, 745 (8th Cir. 1987)). The evidence against Vargas was overwhelming, and she cannot show that the testimony from four witnesses about Garcia's role as a drug trafficker substantially influenced the jury's verdict. Vargas argues that the jury could not compartmentalize the testimony related to Garcia alone, but the jury was instructed to treat Vargas and Garcia separately and give separate consideration to the evidence pertaining to each defendant. <u>See</u> <u>United States v. Mickelson</u>, 378 F.3d 810, 818 (8th Cir. 2004) ("The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions."). We conclude that joinder of the cases was proper and caused no substantial and injurious effect or influence on the jury's verdict.

We affirm the conviction and the sentence.

_____

---

[5]Vargas does not challenge Crompton's testimony on hearsay grounds. Crompton's testimony was admissible as a statement by a coconspirator during the course and in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E).