**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ALBERT ANDREW LUCERO,
*Petitioner-Appellant*,

v.

KIM HOLLAND, Warden,
*Respondent-Appellee.*

No. 15-16111

D.C. No.
1:10-cv-01714-AWI-SKO

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Senior District Judge, Presiding

Argued and Submitted March 14, 2018
San Francisco, California

Filed August 31, 2018

Before: Marsha S. Berzon and Carlos T. Bea, Circuit
Judges, and Terrence Berg,* District Judge.

Opinion by Judge Berzon

---

* The Honorable Terrence Berg, United States District Judge for the
Eastern District of Michigan, sitting by designation.

# SUMMARY[**]

## Habeas Corpus

The panel affirmed in part and reversed in part the district court's denial of Albert Lucero's 28 U.S.C. § 2254 habeas corpus petition challenging his California conviction for premeditated attempted murder, possession of a shank in jail, and participation in a criminal street gang.

The panel held that in light of the framework set forth in *Crawford v. Washington*, 541 U.S. 36 (2004), the Sixth Amendment Confrontation Clause protections established in *Bruton v. United States*, 391 U.S. 123 (1968), concerning the introduction of statements by non-testifying codefendants, do not apply to statements that are nontestimonial. The panel held that a huila—a tiny handwritten gang memo detailing the underlying attack—was not testimonial, and thus could not violate Lucero's constitutional right to confront the witnesses against him. The panel therefore affirmed the district court's denial of Lucero's habeas petition as to his *Bruton* claim.

The panel reversed the district court's denial of Lucero's habeas petition as to his claim under *Jackson v. Virginia*, 443 U.S. 307 (1979), that there was insufficient evidence to support his conviction for possession of a "dirk or dagger or sharp instrument in jail" in violation of Cal. Penal Code § 4502(a). Applying the *Jackson* standards with an additional layer of AEDPA deference, and viewing the evidence in the light most favorable to the prosecution, the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel concluded that there was no evidence that any reasonable juror could view as directly or circumstantially proving, beyond a reasonable doubt, Lucero's conviction for possession of, custody of, or control of a shank in jail; and that any conclusion to the contrary was so clearly without support in the record as to be unreasonable. The panel remanded so that the district court may grant the habeas petition as to that conviction.

## COUNSEL

Johanna S. Schiavoni (argued), Law Office of Johanna S. Schiavoni, San Diego, California, for Petitioner-Appellant.

Lewis A. Martinez (argued), Deputy Attorney General; Tami Krenzin, Supervising Deputy Attorney General; Michael P. Farrell, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Fresno, California; for Respondent-Appellee.

**OPINION**

BERZON, Circuit Judge:

We consider principally whether the Sixth Amendment Confrontation Clause rights protected in *Bruton v. United States*, 391 U.S. 123 (1968), extend to statements that are nontestimonial, *see Crawford v. Washington*, 541 U.S. 36, 68 (2004).

*Bruton* established that in joint criminal trials, the introduction of "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant," but who does not testify, violates the defendant's Sixth Amendment right to confront the witnesses against him. 391 U.S. at 135–36. "The unreliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination." *Id.* at 136; *see also Richardson v. Marsh*, 481 U.S. 200 (1987); *Gray v. Maryland*, 523 U.S. 185 (1998). After *Bruton*, *Crawford* added a new layer to Sixth Amendment analysis—that the Amendment's Confrontation Clause right attaches only as to "testimonial statements." 541 U.S. at 68.

We conclude that because the codefendant statement at issue here was nontestimonial and so not within the Confrontation Clause's protection under *Crawford*, the *Bruton* protections concerning the introduction of statements by non-testifying codefendants do not apply. We therefore affirm the district court's denial of Albert Lucero's habeas petition as to his *Bruton* claim. For reasons explained below, however, we reverse the district court's denial of Lucero's habeas petition as to the sufficiency of the evidence under

*Jackson v. Virginia*, 443 U.S. 307 (1979), on one of the three offenses for which he was convicted, possession of a "dirk or dagger or sharp instrument" in jail, Cal. Penal Code § 4502(a).

## I.

In 2007, Albert Lucero was tried and convicted in a California court of premeditated attempted murder, possession of a shank in jail, and participation in a criminal street gang. *See* Cal. Penal Code §§ 187, 4502(a), 186.22(a).

The attack underlying Lucero's convictions took place in Stanislaus County Jail, in a unit housing members of the Norteño gang. Lucero, also known as "Lil Man" and "Manos," shared a twelve-person cell with two codefendants, Armando Lopez, also known as "Soldier," and Paul Lopez. Another one of Lucero's cellmates was the victim and key witness in this case, Kenneth Lindsay, also known as "Psycho" and "Psychs."

On the day of the attack, Lindsay found and sold balloons containing heroin. According to Lindsay's testimony at trial, Lucero approached Lindsay in the evening and invited him to play cards. After a group began to play, Armando Lopez, Paul Lopez, and Lucero assaulted Lindsay. Armando Lopez hit him in the chest, Paul Lopez punched him in the face, and Lucero kicked him from behind; Lindsay felt a number of other kicks and hits. Several custodial deputies heard Lindsay yell and came to the cell. When they arrived, Lindsay was nonresponsive, and there was blood on the floor and the wall.

The next day, Paul Teso, a sheriff's deputy in a gang unit in Stanislaus County, investigated the attack. When interviewing one inmate, Teso, after directing the inmate to "lift his trouser legs," uncovered a tiny handwritten gang memo inside the inmate's sock. The memo, as later explained by the California Court of Appeal, "detailed the assault on Lindsay and named those who participated in the attack and provided the motive for the attack—Lindsay's failure to follow the gang's code of conduct." The parties referred to this memo and others like it as "huilas."[1]

At the joint trial for Lucero, Armando Lopez, Paul Lopez, and one other codefendant, the huila found in the inmate's sock was entered into evidence in a zoomed-in and redacted form. It was admitted only against its author, Armando Lopez.[2] Teso read the huila out:

> Okay. It says, "To Manos from Soldier: RE," or reason, "IR," incident report. Date is 10-20-06. Says: "Buenos dia[s]. Following will consist of removal that occurred yesterday night, 10-19-6, that I assisted in. Kenneth Lindsay, booking No. 1168261, was removed for degenerate acts, use of drugs, heroin, promoting it, and spreading negativity amongst our people. It has been said that

---

[1] Lindsay testified that "huila" is a Nahuatl word for "kite," used to describe small notes written in jail.

[2] The jury was instructed: "You have heard evidence that defendant Armando Lopez made a statement in the form of a huila . . . . You may consider that evidence only against him, not against any other defendant."

Kenneth, Psychs, Lindsay has numerous priors for violation of RN conduct."

"I arrived here on Thursday, 10-12-06, from DVI, Tracy." It's blurry, but I think it says, "RO, reception." I'm not sure what it stands for. I think it's "RO."

"Since I've been here, I've seen Psych's negativity towards our program and negative attitude towards our people.

"On 10-19, buenos tardes time, me and my—my cellees were placed in a holding cell. During this time, we found three balloons of heroin in the interview room. Psychs found two fat bindles. I found one.

"After returning from the M tanks back to our cell, I forwarded heroin balloons to my proper channels. Psychs didn't forward the two balloons he found. Instead, he took it upon himself to sell it to the whites on our tier without the permission to do so for his own personal gain.

"I seen him dip his finger into both balloons more than necessary to find out if the heroin was chafa, was good, I mean real. Also another"—it says, "another"—I can't read what it says, "see him indulging on it some more by sniffing it up his nose. I said that Psychs tried to get him to do it.

"During this time, around 9:30, Psychs was showering, was showing symptoms of being high on heroin and admitted it to me before program shut down." Then it's blocked out. It says, "I was the hitter. After I hit psychs a few times, in the chest area, I went for the neck. I then noticed my piece broke, and I flushed it.a

"Psychs called, 'man down,' and then the K9's arrived. Gracias. Now with that said, excuse me. I excuse myself with strength and honor. . . ."

After reading out the huila, Teso explained that the huila was written by Armando Lopez, or "Soldier," to Lucero, or "Manos."

Further, Teso noted that gang unit investigators find huilas "quite often," and explained:

Huilas, they use huilas for a bunch or a couple different reasons. The main reason is [to] transfer information from person-to-person from facility-to-facility, from the prisons to the streets, from the streets to the jail, from the jails to the prisons back and forth . . . .

They're also used as a form of discipline. If somebody violates one of the bonds, one of the rules . . . they might have to write an essay on the rule that they broke . . . . Say they violated one of the rules about security, they

might have to write a 1500 word essay in huila form on security.

With regard to huilas, Lindsay, the victim, testified:

Q: How is it written?

A: Usually with hand, pen, pencils. . . . Mini writing, usually really small, trying to say a lot in a little piece of paper, try to make it small to secure it so it's more, it's more easy to get from point A to point B.

Q: Now, these—the writings on these huilas, is this shared with the guards?

A: In Stanislaus County?

Q: Yeah.

A: More often than not guards do get it. That's not the point, not supposed to be caught by the guards. It's supposed to be interoffice. . . . .

After Lucero and his codefendants Armando and Paul Lopez were convicted, they filed a joint appeal. Among other claims, they challenged the introduction of the huila on various state and federal grounds. The California Court of Appeal affirmed the judgment as to all three defendants in 2009.

The Court of Appeal held that the huila's introduction violated Lucero's confrontation rights under *Bruton* and its

progeny, at least as to Lucero's conviction for active participation in a criminal street gang, Cal. Penal Code § 186.22(a), "because [the huila] established 'Manos,' whom the jury understood to be Lucero, as a gang member of status, to whom other gang members would report." Even so, the court found the constitutional error harmless under *Chapman v. California*, 386 U.S. 18 (1967), in light of the "significant amount of independent evidence that" Lucero and his codefendants assaulted Lindsay and the fact that "[t]he jury obviously found Lindsay to be believable." The California Supreme Court denied Lucero's petition for review.

Lucero then filed a habeas petition in federal court. The district court denied the petition, and Lucero timely appealed.

## II.

### A.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may grant Lucero relief on his *Bruton* claim only if the "last reasoned state-court opinion," *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)—here, the opinion on direct appeal to the California Court of Appeal—was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (d)(2).

As we explain, on *de novo* review, Lucero's claim would fail. Because the Court of Appeal's decision was "correct under *de novo* review," it was "therefore necessarily

reasonable under the more deferential AEDPA standard of review." *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010).[3]

## B.

To decide whether the introduction of the huila authored by Lucero's codefendant was unconstitutional, we consider the relationship between the general confrontation rights protected under *Crawford* and its progeny and the specific joint trial confrontation rights protected by the *Bruton* line of cases.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In 2004, *Crawford v. Washington* established a new general framework for enforcing this confrontation right. Looking to "the principal evil at which the Confrontation Clause was directed," "the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused," *Crawford* held that the Confrontation Clause's protections hinge on the "testimonial" character of a statement. 541 U.S. at 50, 68. Under *Crawford*, "absent unavailability and a prior chance for cross-examination, the Confrontation Clause forbids a statement of a nontestifying witness that is testimonial and offered for its truth." *United States v. Brooks*, 772 F.3d 1161, 1167 (9th Cir. 2014). By contrast, "[w]here nontestimonial

---

[3] We note that if the California Court of Appeal's decision was contrary to clearly established Supreme Court law—as we believe it may well have been, as there is no tenable basis for treating a *Bruton* issue as outside of the *Crawford* "testimonial" limitation—its error favored the petitioner, not the government. Precisely how § 2254(d)(1) applies in those circumstances is an issue we need not address, as we reach the same result as did the state court applying *de novo* review.

hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Crawford*, 541 U.S. at 68.

Decades before *Crawford*, *Bruton* derived a more specialized principle from the Confrontation Clause. *Bruton* recognized that, in joint trials, when one nontestifying codefendant's confession is admitted only against that codefendant, there is unavoidably a "substantial risk that the jury, despite instructions to the contrary, [will] look[] to the incriminating extrajudicial statements in determining [the other defendant's] guilt." 391 U.S. at 126. *Bruton* went on to note that "a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him." *Id.* at 126 (internal quotation marks omitted). That opportunity is absent as to "powerfully incriminating extrajudicial statements of a codefendant" admitted in a joint trial when, as is most usual, the codefendant does not testify. *Id.* at 135.

Thus *Bruton* (and its progeny *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998)), held that "[a] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson*, 481 U.S. at 207. By contrast, "no Confrontation Clause violation occurs when 'the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.'" *United States v. Parks*, 285 F.3d 1133, 1138 (9th Cir. 2002) (quoting *Richardson*, 481 U.S. at 211).

The specialized rules of *Bruton* fit comfortably within the *Crawford* umbrella. As the Third Circuit has reasoned, "because *Bruton* is no more than a by-product of the Confrontation Clause, the Court's holdings in . . . *Crawford* likewise limit *Bruton* to testimonial statements." *United States v. Berrios*, 676 F.3d 118, 128 (3d Cir. 2012).

More specifically, both *Bruton* and *Crawford* have the same origins—the importance placed on cross-examination in the Confrontation Clause, and the prejudice defendants face when they are unable to cross-examine "powerfully incriminating" statements. *Bruton*, 391 U.S. at 136. *Crawford* concluded after a historical analysis that the Confrontation Clause was concerned only with certain kinds of out-of-court statements—those derived from interrogations and other forms of "the civil-law mode of criminal procedure." *Crawford*, 541 U.S. at 50. *Bruton*'s narrower focus was on whether statements that would otherwise violate the Confrontation Clause may be introduced in a joint trial. Its holding—essentially, that such statements may not be introduced if the defendant is identifiable—does not define, or redefine, the basic scope of the Confrontation Clause's protections. Ergo, the *Bruton* limitation on the introduction of codefendants' out-of-court statements is necessarily subject to *Crawford*'s holding that the Confrontation Clause is concerned only with testimonial out-of-court statements.

*Crawford* confirms this straightforward conclusion. It includes as one of its alternate definitions of "testimonial" the "extrajudicial statements . . . contained in formalized testimonial materials, such as . . . confessions." 541 U.S. at 52 (internal quotation marks omitted).

Every circuit court to consider the issue—most circuit courts in the federal system, but, until today, not ours—has concluded that *Bruton*'s rule now applies only to testimonial out-of-court codefendant statements. *See United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010); *Berrios*, 676 F.3d at 128; *United States v. Dargan*, 738 F.3d 643, 651 (4th Cir. 2013); *United States v. Vasquez*, 766 F.3d 373, 378–79 (5th Cir. 2014); *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009); *United States v. Avila Vargas*, 570 F.3d 1004, 1008–09 (8th Cir. 2009); *United States v. Clark*, 717 F.3d 790, 813–17 (10th Cir. 2013); *United States v. Wilson*, 605 F.3d 985, 1016–17 (D.C. Cir. 2010).

We agree, and conclude that only testimonial codefendant statements are subject to the federal Confrontation Clause limits established in *Bruton*.

## C.

Our question, then, is whether the huila was testimonial in the *Crawford* sense. It was not.

First, a preliminary issue: Lucero maintains that we should not reach whether the huila was a testimonial statement. He posits that the government did not argue in the state courts or in the district court that the huila was nontestimonial, and so either has forfeited, or should be judicially estopped from making, any argument as to that question.

The government did argue in the district court that the huila was not testimonial. The district court acknowledged

the argument but found it unnecessary to resolve. There was no forfeiture in the federal habeas proceedings.

The government did not address the testimonial nature of the huila in state court proceedings. But judicial estoppel against the government with regard to arguments it now makes concerning the Confrontation Clause's inapplicability is not appropriate. One factor in considering whether judicial estoppel applies is whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001) (internal quotation marks omitted). In this case, by assuming in the state court that the Confrontation Clause applied, the government did not gain any advantage or impose a detriment on Lucero. Instead, the government made its case more challenging. As no other equitable considerations support the application of judicial estoppel here, there is no impediment to considering whether the contested huila is testimonial. *See generally Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270–71 (9th Cir. 2013).**[4]** The question whether the huila was or was not testimonial under *Crawford* is therefore properly before us.

"While *Crawford* declined to provide a comprehensive definition of testimonial, the Court stated various formulations of the core class of testimonial statements." *United States v. Esparza*, 791 F.3d 1067, 1071 (9th Cir. 2015)

---

**[4]** Lucero does not maintain that there is a state court exhaustion requirement applicable to the government in federal court habeas cases. *Cf. Dixon v. Baker*, 847 F.3d 714, 718–19 (9th Cir. 2017) (describing exhaustion principles for federal court habeas petitioners under 28 U.S.C. § 2254(b)(1)(A)).

(alterations and internal quotation marks omitted).  Included within that class are:

> ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 1071–72 (quoting *Crawford*, 541 U.S. at 51–52).

The Court has further explained the boundaries of testimonial evidence through "what has come to be known as the 'primary purpose' test." *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015).  Under that test, statements are testimonial when they result from questioning, "the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution," *Davis v. Washington*, 547 U.S. 813, 822 (2006), and when written statements are "functionally identical to live, in-court testimony," "made for the purpose of establishing or proving some fact" at trial, *Melendez-Diaz v. Massachussetts*, 557 U.S. 305, 310–11 (2009) (internal quotation marks omitted).  "To determine . . . the primary purpose" of a statement, "we objectively evaluate the circumstances in which the encounter occurs and the

statements and actions of the parties." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011) (internal quotation marks omitted).

The written huila introduced against Lucero was not "testimonial" under any plausible understanding of that term. The huila was not "functionally identical to live, in-court testimony," *Melendez-Diaz*, 557 U.S. at 310–11, and it did not "ha[ve] the primary purpose of assisting in [the defendant's] prosecution," *Clark*, 135 S. Ct. at 2177. Rather, the huila was a gang memo designed *not* to fall into the hands of government officials; it was purposely "ma[d]e . . . small to secure it so it's . . . more easy to get from point A to point B," that is, to avoid detection. The huila had, by all accounts, a primary purpose of "transfer[ring] information from person-to-person from facility-to-facility" among gang members, and, occasionally, serving "as a form of discipline" within the gang. Even though, as the victim admitted, "[m]ore often than not guards do get it[,] [t]hat's not the point . . . . It's supposed to be interoffice."

Lucero notes that, "[w]hen the huila was written, the co-defendants were aware the prison was investigating the offenses." He compares the huila to the statement found to be testimonial in *Esparza*, 791 F.3d at 1073–74—a "Notice of Transfer/Release of Liability" sent to the state Department of Motor Vehicles ("DMV") by an individual "not . . . for the routine administration of the DMV's affairs," but instead as a "statement" in the face of "potential criminal exposure" and in response to an "ongoing investigation." *Id.*; *see also United States v. Macias*, 789 F.3d 1011, 1018 (9th Cir. 2015) (holding testimonial an affidavit made "at the behest of the prosecutor").

Lucero's contention misses the point. Unlike in *Esparza*, there is no evidence here that the huila was *intended*, as a "primary purpose" or otherwise, to impact a trial or other criminal proceeding through, for example, a district attorney, defense attorney, police, other witnesses, or any other person even possibly connected to the potential criminal proceedings.[5] The only evidence concerning huilas indicated that they are specifically *not* meant to fall into the hands of guards or police or prosecutors, or to be used in a courtroom. Instead, huilas are supposed to serve exclusively as internal gang communications. And the evidence concerning the purpose of huilas matches up with the characteristics of the huila admitted in this case. The huila was a tiny document, written in tiny lettering, filled with gang jargon.

True, the huila itself is somewhat formal in places, simulating an official document—it includes the victim's full name and booking number, and it provides a full factual accounting of the events. But those characteristics "do[] not necessarily render . . . the statements contained therein 'testimonial' for purposes of the Confrontation Clause." *United States v. Fryberg*, 854 F.3d 1126, 1136 (9th Cir. 2017). Rather, the huila was a "document owing its existence primarily to . . . administrative needs," *id.*—here, unusually, to the administrative needs of a gang—and was created for reasons unrelated to a future prosecution. Because the huila

---

[5] As the Supreme Court has noted, although statements to private individuals "are much less likely to be testimonial than statements to law enforcement officers," "at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns." *Clark*, 135 S. Ct. at 2181. In other words, to determine the testimonial intent of a speaker, "[c]ourts must evaluate challenged statements in context, and part of that context is the questioner's identity," *id.* at 2182, or, as more relevant here, the written document's audience.

was "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial," the huila was "not testimonial." *Melendez-Diaz*, 557 U.S. at 324.

Under any standard of review, as the huila was not testimonial, its introduction could not violate *Bruton*, and Lucero's constitutional right to confront the witnesses against him was not violated.

## III.

Lucero's second argument is that his conviction for possession of a shank while in custody, Cal. Penal Code § 4502(a), violated *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Lucero contends that the stringent standard was met with regard to his conviction for using or having control over the shank used during the jailhouse attack against Lindsay, and that the state Court of Appeal's conclusion to the contrary was unreasonable under the doubly deferential standard applicable to *Jackson* claims under AEDPA, *see* 28 U.S.C. § 2254(d); *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).

## A.

Under AEDPA, the determinative question as to Lucero's *Jackson* claim is whether the Court of Appeal's reasoning was "an unreasonable application of . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1). In addressing that

question, we must be careful to distinguish "an *unreasonable* application of federal law . . . from an *incorrect* application of federal law" and to give the state court's decision "the benefit of the doubt," *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). A federal court "may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees . . . . [but] only if the state court decision was objectively unreasonable." *Coleman*, 566 U.S. at 651 (internal quotation marks omitted). Cognizant of these admonitions and others like it, we tread very cautiously as to this claim, recognizing that the deferential standard under AEDPA "is difficult to meet because it was meant to be." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (per curiam).

We conduct our doubly deferential inquiry under the established principle that "[u]nder *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 566 U.S. at 655 (citation and internal quotation marks omitted). The California law underlying Lucero's relevant conviction applies to "[e]very person who, while at or confined in any penal institution . . . , possesses or carries upon his or her person or has under his or her custody or control any instrument or weapon of the kind commonly known as a . . . dirk or dagger or sharp instrument." Cal. Penal Code § 4502(a). "Possession may be actual or constructive. . . . A defendant has actual possession when he himself has the weapon. Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object." *In re Daniel G.*, 120 Cal.

App. 4th 824, 831 (2004). "[E]xclusive possession or control is not necessary." *People v. Rice*, 59 Cal. App. 3d 998, 1003 (1976). What is necessary, absent physical possession, is "a knowing exercise of dominion and control over an item." *People v. Mejia*, 72 Cal. App. 4th 1269, 1272 (1999).

## B.

In the last reasoned state court decision in Lucero's case, *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018), the California Court of Appeal concluded on direct appeal that there was sufficient evidence that Lucero constructively possessed a shank. It reasoned as follows:

> Other than the huila, there is evidence that a shank was used in the attack. Lindsay[, the victim,] heard whispering while he was in the shower, and [Lucero's] card game invitation was obviously a ruse requiring more than one participant. P. Lopez[, one of Lucero's codefendants,] was grinning and told Lindsay, in essence, to die. The circumstances and context of the attack are sufficient to support a finding that all three defendants had constructive possession of a weapon, were working together, and intended to kill Lindsay.

"[A]pplying the standards of *Jackson* with an additional layer of [AEDPA] deference," *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005), and "view[ing] the evidence in the light most favorable to the prosecution," *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (internal quotation marks omitted), we conclude there was no evidence that any

reasonable juror could view as directly or circumstantially proving, beyond a reasonable doubt, Lucero's conviction for possession of, custody of, or control of a shank in jail, and that any conclusion to the contrary was so clearly without support in the record as to be unreasonable.

As noted by the California Court of Appeal, the relevant evidence admitted against Lucero, viewed most favorably to the prosecution, consisted of the following: Lindsay's testimony that he suffered scrapes on his neck and a "puncture wound" on his chest that "scabbed over . . . [and] fell off"; Lindsay's testimony that Lucero's codefendant, "Armando Lopez[,] hit me in the chest"; pictures of Lindsay after the assault indicating there was a mark on his chest; Lindsay's testimony that Lucero invited him to the card game ruse, and then kicked and hit him; and the gang expert's testimony that "[o]ne of the hostile policies for the Norte[ñ]o is [it is] mandatory for them to have access to weapons at all times."[6]

This evidence, viewed most favorably to the prosecution, indicated that Lucero generally "ha[d] access to weapons at all times," and that Lucero's codefendant Armando Lopez, who also generally "ha[d] access to weapons at all times," "hit" Lindsay in the chest and left a "puncture wound." The evidence also indicated that Lucero coordinated the attack against Lindsay with Armando Lopez. Further, we defer to the state Court of Appeal's conclusion that because Lindsay testified that he received scrapes and a "puncture wound,"

---

[6] The expert repeated that testimony again on cross-examination: "Q: And you also stated that each individual in a cell must have access to a weapon? A: Part of their household policies, you're supposed to have access to a weapon at all times."

there was sufficient evidence even without the huila for a jury to conclude that Armando Lopez attacked Lindsay with a shank, and so possessed and controlled it.

Yet, there were *no* facts from which to infer that Lucero, personally, had "under his control" the shank Armando Lopez used to stab Lindsay. *Daniel G.*, 120 Cal. App. 4th at 831 (finding sufficient evidence of constructive possession when a minor had a "weapon . . . passed back to [him], . . . then passed it in turn to the others, creat[ing] a reasonable inference that the weapon was under his control"). No gang expert testimony or other evidence indicated that Lucero had the right to control or share another gang member's shank.[7] There was no indication that there were shared shanks in the cell in general, no indication that any shank used in the attack was shared or stored in a jointly accessible location, and no indication that Lucero had or used his own shank during the coordinated attack against Lindsay.[8]

---

[7] The huila Armando Lopez authored affirmatively indicated otherwise. It read, "I was the hitter. After I hit psychs a few times, in the chest area, I went for the neck. I then noticed my piece broke, and I flushed it." Of course, this huila was not admitted against Lucero under California evidence law. So we mention it only to note that, as Lucero feared, if the jury improperly considered the huila as evidence against him—something we would not assume in light of the fact that they were properly instructed to not do so—the huila provided evidence that Armando Lopez had sole control of the shank. Lopez called himself "the hitter" and referred to the shank as "my piece" over which he made unilateral decisions, including the decision to "flush[]" the shank to avoid its detection.

[8] We mention only the most obvious sorts of evidence that one might look for in cases of this kind, as suggested by California case law. We do not mean to suggest that any particular form of evidence is required to support the Court of Appeal's reasoning or the jury's verdict. Our job

So the *only* admitted evidence possibly pertinent to Lucero's own possession, custody over, or control of the shank was the gang expert's testimony that, as a gang member, Lucero was "supposed to have access to a weapon at all times." But sole reliance on that testimony to establish that Lucero had the right to control the shank used in the attack, or any shank, would be unreasonable, for two compelling reasons.

First, under California law, "[a]ccess to an item, but with unspecified restrictions, is not the same as having the right to control it." *People v. Sifuentes*, 195 Cal. App. 4th 1410, 1419 n.6 (2011), *disapproved on other grounds in People v. Farwell*, 5 Cal. 5th 295, 304 n.6 (2018). "For example, an employee may have access to another coworker's desk, but it does not logically follow that the employee gains the right to exercise control over the items on the desk, such as keys or a wallet." *Id.*

California courts have found sufficient evidence of constructive possession when a shared piece of contraband is found in a location jointly accessible to defendants, and when one defendant has directed another to use the shared piece of contraband. *See People v. Miranda*, 192 Cal. App. 4th 398, 410–411 (2011); *People v. Showers*, 68 Cal. 2d 639, 644 (1968). But the critical factors in those cases were missing here: There was no evidence in this case as to where the

under AEDPA is to avoid a "type of fine-grained factual parsing" that does not accord deference to either jurors or state courts, and instead to survey *any* possible fact in the record that could support, directly or circumstantially, the jury's conviction. *Coleman*, 566 U.S. at 655. There may be many other forms of circumstantial evidence from which a jury could infer non-exclusive control over a weapon, but there was no such evidence here.

shank was stored, much less whether Lucero had access to it there (or any place else). And the gang expert stated only that gang members were supposed to have some access to a weapon, not that the required access had to be unrestricted and so tantamount to control. In short, the gang expert's testimony provided no evidence that Lucero personally had *any* control *at any point* of a shank. Concluding otherwise would not be reasonable.

Second, the gang expert's testimony was that gang members were supposed to have access to *a* weapon at all times, but not to the sort of weapon Lucero was charged with having control over—a "dirk or dagger or sharp instrument." Cal. Penal Code § 4502(a). No reasonable jurist could conclude that evidence concerning access to *some* weapon was sufficient to establish that Lucero was guilty of the crime with which he was charged. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is *charged*." (emphasis added)).

In sum, there was certainly sufficient evidence, as the Court of Appeal held, to infer that Lucero participated in and helped coordinate the attempted murder of Lindsay, who, after being severely hit and kicked by three men, was found bleeding and nonresponsive on the floor of the jail. And it was reasonable to regard the evidence as sufficient to conclude that a sharp instrument was used in the attack. But, as California courts have made clear, constructive possession, custody, or control is distinct from aiding and abetting a co-defendant's control and possession. That Lucero helped set up the attack against Lindsay does not support an inference that passes "the threshold of bare rationality," *Coleman*,

566 U.S. at 656, that he personally possessed, or had physical custody of or non-physical control over, the shank someone else used in that attack.

In most AEDPA cases concerning *Jackson* claims, we are "faced with a record of historical facts . . . support[ing] conflicting inferences," resolution of which we must avoid at all costs "even if [resolution of the conflict] does not affirmatively appear in the record." *Cavazos*, 565 U.S. at 7 (internal quotation marks omitted). In Lucero's case, there are *no* facts, direct or circumstantial, to support Lucero's own possession of, custody of, or control over the shank.

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman*, 566 U.S. at 655. But, here, it would be unreasonable to conclude that a reasonable juror could find adequate evidence of the essential element—possession or custody or control over a "dirk or dagger or sharp instrument," Cal. Penal Code § 4502(a)—to meet the beyond-a-reasonable-doubt standard. To infer that Lucero himself did have any of those connections to the shank would be sheer speculation.

We reverse the district court's holding as to Lucero's conviction for possession of a shank in custody and remand with directions to grant Lucero's habeas petition as to that conviction.

## IV.

We affirm the district court's denial of Lucero's habeas petition as to his *Bruton* claim. We reverse the district

court's denial of Lucero's habeas petition as to his *Jackson* claim on the Cal. Penal Code § 4502(a) conviction, and remand so that the court may grant Lucero's habeas petition as to that conviction.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**